(No. 43452.–■■■■■■■■■

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROGER PIERCE, Appellant.

*Opinion filed November 30, 1972.*

GERALD W. GETTY, Public Defender, of Chicago (JAMES N. GRAMENOS, Assistant Public Defender, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General and ELMER C. KISSANE and RICHARD PEZZOPANE, Assistant State's Attorneys, of counsel), for the People.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant, Roger Pierce, was tried before a jury in the circuit court of Cook County and found guilty of the attempted robbery of Chicago taxi driver, James Dotson. Pierce was sentenced to a term of eight to ten years imprisonment in the Illinois State Penitentiary. This appeal is from that judgment.

Defendant urges that the trial court erred in not suppressing the complaining witness's identification of him because defendant was not represented by counsel at a pre-indictment lineup. He asserts further that the identification procedure as conducted was so suggestive as to be conducive to irreparable mistaken identification. Finally, he complains that the minimum term of eight years to which he has been sentenced is excessive in light of our statutory provisions regarding indeterminate sentences and parole.

The complaining witness, Dotson, testified that while driving his cab in the vicinity of 61st and Cottage at about 3 A.M. on the morning of March 20, 1968, he saw two

male Negroes standing behind a 1963 Pontiac parked in the middle of the street with its hood up. The two men hailed him and, thinking that they were out of gas, Dotson pulled around the corner to meet them. The men swiftly approached the cab from about 60 feet away and got into the back seat, asking to be taken to 63rd and Greenwood. Dotson commenced to do so and after driving about two blocks heard the man on the right side of the passenger seat say something. When Dotson turned, he observed that man holding a gun, which Dotson grabbed impulsively. After "hitting the brakes," Dotson "flipped" into the back seat on top of the man on the right and a struggle ensued, with the second passenger striking and pulling on Dotson. The driver managed to kick the man with the gun into the front seat, whereupon both of them jumped out of the taxi, which by then had collided with several parked cars. Still armed with the gun, the passenger demanded Dotson's money and ran up to him. Dotson again attempted to fight off his assailant, throwing him against the door of the cab. The other passenger, now also out of the taxi, struck Dotson a number of times and then wrestled him to the ground. As both men converged on the driver, a police squad car came around the corner. The two men left Dotson and ran into a gangway, with two officers in close pursuit. The policemen returned shortly after capturing the right-side passenger, Bryant Belmore, and recovering a .32 caliber revolver, lying on the ground near him. Dotson identified Belmore positively at that time. The other passenger escaped.

Dotson further testified that he was summoned to the Third District police station the next morning by a telephone call around 9 A.M. He went to the station and attended a lineup conducted in the squad room where at least one other taxi robbery victim, identified only as Mr. Parker, was present, together with a number of policemen. Dotson described the lineup as consisting of about six male Negroes whose faces were turned to the wall. When asked

to identify the men who robbed him, Dotson kicked defendant Pierce in the seat of the pants. Bryant Belmore, whom he had already identified, was also in the lineup; Dotson identified him by touching him with his hand. Dotson stated that he recognized the leather coats, dark clothing and dark shoes that Pierce and Belmore were wearing, as well as their processed hair. Dotson identified the defendant in court as being one of the two men who attempted to rob him.

Officer John O'Brien testified that he was in the police car which first came upon the crime scene. He stated that he and his partner heard the sounds of an automobile crash while patrolling 63rd Street. As they turned north on Langley Avenue toward the accident, they saw three men struggling beside a taxicab. When O'Brien alighted from the police car and "announced his office," two of the men jumped up and ran toward a gangway, with O'Brien and his partner giving chase. The gangway was dark but when the two suspects ran into a brightly lighted alleyway, O'Brien was able to see both of the men at a distance of 8 to 10 feet before they turned and ran down the alley. The smaller of the two, Belmore, ran into a basement passageway and was apprehended there by O'Brien, who also found next to Belmore the .32 caliber revolver with one misfired round under the firing pin. O'Brien identified defendant Pierce in court as the other man he chased that night. The case report prepared by O'Brien from his own recollections and those of Dotson describes the second offender as being approximately 5 feet 8 inches in height, weighing 170 pounds, and wearing a three-quarter length black leather coat.

Detective George Rohrer testified that he was one of the officers who arrested defendant Pierce later that morning, at approximately 8:30 A.M., as Pierce arrived at 6540 South Minerva in a taxicab. The arrest report this officer prepared describes Pierce as being 6 feet tall, weighing 180 pounds, and wearing a three-quarter length

black leather coat. Later that day Detective Rohrer conducted the lineup in the Third District squad room to ascertain whether any of the several taxi robbery victims summoned could identify the suspects. He testified that there were six subjects in the lineup including Belmore and Pierce, and that all were male Negroes of similar appearance, casually dressed. He could not recall any details concerning their age, height or weight. No photograph was made of the lineup and although the detective testified that he completed a lineup report, it could not be produced at trial. He stated that the six subjects were brought into the squad room, asked their name, address and occupation individually and then told to make a number of turns. Defendant and Belmore were Nos. 2 and 6 in the lineup. When the subjects had turned to face the wall, the complainants were asked to identify the offenders. Dotson walked behind defendant Pierce and kicked him in the seat of the pants. Dotson identified Belmore by touching him on the shoulder with his hand. Detective Rohrer also remembered that the defendant had been burned in the neck by a cigarette during the lineup, but this apparently was done by Parker.

During the hearing on the motion to suppress identification, defendant Pierce and Bryant Belmore testified to the circumstances of Pierce's arrest and the lineup conducted at the Third District station. Both stated that when defendant Pierce was taken into custody on South Minerva, Dotson and the complaining witness in another case were present, sitting in the back of a squad car; that later in the day at the police station there were only four men in the lineup and the two other subjects were dressed in beige or tan trenchcoats; that Pierce and Belmore were the only suspects wearing black leather coats. Both maintained that they were wearing handcuffs, while the other two subjects were not; that they were standing next to each other at one end during the lineup; Pierce stated that before the identification was made he heard a voice

say, "What about the two on the end?" Belmore said he remembers Pierce being burned with a cigarette, but did not see him kicked; Pierce testified that he requested permission to make a telephone call before the lineup but was refused.

James Sammons testified on behalf of the defense that he had had a conversation with complainant Dotson before trial, while he, Sammons, was defendant Pierce's appointed counsel. He stated that when he asked Dotson how he happened to be called to the police station to make an identification, Dotson had replied that the police called and told him that they "had arrested a man named Pierce."

*People v. Palmer (1969), 41 Ill.2d 571,* is dispositive of defendant's contention that he was entitled to counsel at his pre-indictment lineup, and we decline defendant's invitation to overrule *Palmer,* as we have recently interpreted it in *People v. Williams, 52 Ill.2d 455,* and *People v. Burbank (1973), 53 Ill.2d 261. Kirby v. Illinois (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.*

The question whether the lineup which resulted in identification of the defendant was "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law" requires more extended consideration. Citing *Stovall v. Denno (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967,* defendant contends that the circumstances of that lineup were improperly suggestive and prejudicial. Much of the testimony regarding the lineup was contradictory, raising credibility questions for resolution by the jury. Several facts, however, appear reasonably clear. The lineup was viewed simultaneously by several victims of taxi robberies who were able to discuss the identifications among themselves, and the kicking and burning incidents are, of course, inherently improper. The United States Supreme Court, in describing the *Gilbert* lineup, condemned "wholesale identifications of Gilbert as the robber in each

other's presence, a procedure said to be fraught with dangers of suggestion." (Footnotes omitted.) *United States v. Wade (1967), 388 U.S. 218, 234, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, 1936.*

Additionally, defendant Pierce and Bryant Belmore were apparently the only subjects in the lineup wearing leather coats, which had been described previously by complainant Dotson. An identical practice was found to be an "unfair lineup procedure" in *Foster v. California (1967), 394 U.S. 440, 442, 22 L. Ed. 2d 402, 406, 89 S. Ct. 1127, 1128.* As noted in *United States v. Wade (1967), 388 U.S. 218, 230, 18 L. Ed. 2d 1149, 1159, 87 S. Ct. 1926, 1934,* in these circumstances judicial appraisal of the integrity of the identification process would be substantially assisted by the presence of either a lineup photograph or report.

However, in our judgment, complaining witness Dotson's in-court identification was properly received. It is clear from the record that he had a more than adequate opportunity to observe defendant Pierce during the commission of the crime. The testimony at the hearing to suppress identification showed that Dotson watched the men approach his cab from 60 feet away on a brightly lighted street. When they entered the cab, its dome light gave him a better chance to observe their faces, which he did. At all times during the struggle, which lasted several minutes, both in and out of the taxi, bright street lamps illuminated the scene. Under these circumstances, we conclude that complainant Dotson's positive and unwavering identification of the defendant finds support in the record and that his testimony has a source independent of the lineup.

Defendant's final contention that his minimum sentence is violative of statutory provisions concerning indeterminate sentences and parole is without merit. Defendant had previously served a 10-year sentence for

voluntary manslaughter, and we find no reason to disturb the minimum fixed by the trial court.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*