The People of the State of Illinois, Plaintiff-Appellee, *v.* Freddie Martin, Defendant-Appellant.

(No. 59221; )

First District (1st Division)—December 2, 1974.

Edward M. Genson, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Michael J. Polelle, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, Freddie Martin, was convicted of robbery after a bench trial and sentenced to a prison term of 5 to 10 years.

On October 28, 1971, Mary Prendergast was taking care of her daughter's children at 1348 West 97th Street in Chicago. Around 11:30 A.M. she answered the front door and saw a black male, about 22 or 23 years of age with bushy hair, of medium height and slender build, wearing red pants and a red shirt. At the trial she identified that man as the defendant. He asked to use a telephone to call an ambulance because there had been an accident and a lady was lying in the street bleeding badly. She let him in, and he appeared to use the telephone for an ambulance, giving the address of the accident. He asked, and was permitted, to use the bathroom. After stepping from the bathroom and looking down the hallway, he walked toward the front door and then asked if he should call the police too. She agreed and looked up the number for him. While she was looking in the directory, the phone rang. The call was from her daughter, whom she told that there had been an accident and asked to call back. The defendant used the phone again, apparently calling the police and reporting an accident at 97th and Loomis. After this call, the man asked Mrs. Prendergast if he could show her where the injured lady lived. As he proceeded to point to the house, he turned and faced her saying, "Now, this is a robbery." He threw his arm around her neck, took her down the hallway to the back bedroom and told her to lie down and not get up. He then went through the house, searching all the rooms and drawers. He returned to her and asked where the money was. As he did this, the phone rang but was left unanswered. She told him that she didn't live there and that her daughter's bedroom was the middle bedroom. He then went to that room to search. The phone rang again and was again left unanswered. During this continued searching, a neighbor, Mrs. Boyland, came to the front door and called out for Mrs. Prendergast. Thereafter, the man apparently left. Mrs. Prendergast went to the front door and told Mrs. Boyland of the robbery. Mrs. Boyland had been summoned by Mrs. Prendergast's daughter by telephone. The man was in the house about a half hour, and it was an unusually bright day.

Mrs. Howland, Mrs. Prendergast's daughter, came home and found that her daughter's General Electric phonograph was missing, as was Mrs. Prendergast's purse. At trial, she identified her daughter's portable General Electric phonograph and said she recognized it from a certain chocolate mark and a slash on the inside cover.

A neighbor, James Johnson, had come home around 11:30 on the morning of October 28 and noticed an unoccupied car parked with its

712

motor running. After watching the car for several minutes, Johnson, who was a security guard for Illinois Bell, walked by the car and wrote down the license number and make and year of the car. He testified that it was a light-blue or green Pontiac with license PT221. He watched for several more minutes and saw a man come out from between the houses and get into the car and drive off. Johnson was unable to see the man's face but he described him as a small, thin, black man with a brown case under his arm. He had a conversation with Mrs. Prendergast and Mrs. Boyland and gave one of them the piece of paper on which he had written the license number and the description of the car. At the trial, he identified pictures of the defendant's automobile as being the same car he had seen at the scene of the robbery.

The police arrived, and after receiving the description of the offender and the license number, patrolled the area in search of the vehicle. A registration search by Officer Walsh was made in an attempt to establish ownership of the plates by the license number, but this attempt failed to show an owner. It was later established, after the defendant was arrested, that the plates were registered to a "Fred Williams." After approximately 30 minutes, Officers Schwartz and Walsh received a radio communication directing them to proceed to 89th and May Street where other officers had located a 1963 blue Buick Wildcat, license PT221, in the alley behind 8840 South May Street. Walsh recalled that the vehicle was the same one he had seen several weeks earlier when Sergeant James Gorman had called for assistance in a street stop. On that occasion they had questioned the driver, whom Walsh recalled as giving the name, Freddie Martin. He had been stopped for failure to have a city vehicle license. Sergeant Gorman had also summoned a Lieutenant Collins in an effort to see if Freddie Martin fit the description of a man involved in a recent homicide. After the officers decided not to arrest Martin at that time, the lieutenant ordered Walsh to get a picture of Freddie Martin and note on the back his name and address for their file. Walsh obtained this picture 2 or 3 days later from Records and Identification at Police Headquarters and kept it in the files at the 6th District. Walsh then proceeded to the 6th District Station and obtained the address, 8840 South May Street, from the back of Freddie Martin's picture. A description of Freddie Martin and a notation "1963 Buick" was also on the back of the picture. Walsh then returned to the location of the car behind 8840 South May Street. The defendant was arrested in his bedroom, and the police recovered, 10 feet from the defendant, a brown portable phonograph, which was later identified by Mrs. Howland.

The defendant contends that the phonograph should have been suppressed for a number of reasons: (1) The police did not have probable

cause to make the arrest; (2) they should have obtained a warrant; and (3) the search was too broad.

■■ The evidence establishes that a robbery had in fact been committed; the police had a description of the offender which included the fact that he was wearing red pants and they had been informed that a brown phonograph had been taken; they had a description of a car and a license number that they could reasonably believe was used in the robbery; later investigation established that the car had been driven on a previous occasion by Freddie Martin and the car was parked behind Freddie Martin's home; they went to Freddie Martin's room and saw that he fit the description given by Mrs. Prendergast, including the color of his pants; and, finally, they saw a brown phonograph 10 feet from the defendant. This was a strong case of probable cause, and we agree with the trial court's conclusion that "it would have been a violation of the oath of the officers if they had not so arrested him at that time."

In *People v. Johnson*, 45 Ill.2d 283, 287-88, 259 N.E.2d 57, two robbery victims gave descriptions including approximations of height, weight, age and a speech impediment. When a second robbery occurred 3 months later, the police were given the name and address of a suspect and placed the building under surveillance. The police saw the defendant enter the apartment. When he came to the door in response to their knock, they noticed that he fit the description given and placed him under arrest. A subsequent search of the apartment disclosed stolen property. To the defendant's claim that the evidence was "tainted by an unlawful invasion of his apartment" since they did not have a warrant, the court said in upholding the search:

> "Defendant argues, incorrectly, that a warrantless entry is permissible only in hot pursuit, or in any emergency when it is impractical to obtain a warrant. We agree that it is desirable for an arrest to be based upon a warrant when the circumstances permit, and such action here would have eliminated some of the problems now before us. At the same time, however, we recognize that an arrest may be lawful when based upon probable cause, notwithstanding the absence of a warrant. [Citation.]" (45 Ill.2d 283, 287-88.)

We believe the facts in this case are even stronger than *Johnson*, and the police could not "have been expected to bow out and return to headquarters to procure a warrant." *United States v. Harris* (D.C.C. 1970), 435 F.2d 74, 80.

■■ In his contention that the search was too broad in scope, the defendant relies primarily on *Chimel v. California*, 395 U.S. 752, 23 L.Ed.2d 685, 89 S.Ct. 2034. The rule of *Chimel* has been paraphrased in *People*.

*v. Williams,* 57 Ill.2d 239, 243, 311 N.E.2d 681: "[A] warrantless search incident to an arrest may be made of the defendant's person plus the area within his immediate control from which he might obtain either a weapon or an evidentiary item. [Citation.]" In *Williams,* the defendant was arrested in the kitchen area of his apartment. When the police made the arrest they had their guns drawn. After arresting and searching the defendant, one of the officers reached into a bag on an open kitchen shelf and found the defendant's gun. The bag was estimated to be between 7 and 10 feet away from where the defendant was standing. The court, in upholding the search and discussing the application of *Chimel* to other cases, concluded that results had not been entirely consistent and added (at page 246):

> "These cases make it clear, we think, that there can be no hard and fast rule defining the permissible scope of a warrantless search incident to an arrest. Certainly an arbitrary limitation to a certain number of feet would be unsatisfactory. Whether the search is reasonable must depend on the particular facts of the case. Among the factors to be considered in this case are the knowledge that the suspect was armed, the presence of another person who might attempt to assist the suspect, the accessibility of the searched area, and the physical control of the situation exercised by the police."

In *People v. Perry,* 47 Ill.2d 402, 265 N.E.2d 330, the officers broke down a door and entered a room 10' by 12' in dimensions. The defendant was standing near the door about 8 feet from the window and had put something in or taken something out of the top dresser drawer. The officer searched the defendant and took him into the corridor. They continued the search of the room and found a gun in the partially opened dresser drawer and some shells and a purse belonging to a woman who was also in the room. The court held that the search did not violate the rule of *Chimel* "since it was within the area from which defendant could have obtained a weapon or something that could have been used as evidence against him." Judging from the standards of *Williams* and *Perry,* we deem that the search was within an area from which the defendant could have obtained something that could have been used as evidence against him and the trial court did not err in denying the motion to suppress the phonograph.

The defendant, in his contention that the court erred in denying his motion to suppress the in-court identification, advances the argument that it was based on an improperly suggestive lineup because: (1) The defendant was the only man in the lineup wearing red clothes similar to those worn by the robber and noted by Mrs. Prendergast; and (2) Mrs. Prendergast was told that the police had a "suspect" in custody be-

fore viewing the lineup. The defendant's motion to suppress evidence was based solely on an allegedly improper arrest. He never argued that the lineup procedures were improper. Although we believe he has waived the argument here (*People v. Brown,* 15 Ill.App.3d 606, 304 N.E.2d 662 (abstract opinion).) Nonetheless, we will address ourselves to the question.

Immediately after his arrest the defendant was taken to the police station wearing only the reddish colored pants that he had on at the time of his arrest. His sister testified that his wife brought a shirt and some underclothes to the defendant in the station around 2 P.M. The defendant was identified by Mrs. Prendergast in a lineup conducted at approximately 3 P.M. The lineup was held with five male Negoes between the ages of 18 and 22.

In determining whether an identification procedure was so unnecessarily suggestive as to warrant suppression, that procedure must be considered in light of the totality of the facts and circumstances surrounding the particular confrontation between the witness and defendant. (*People v. Blumenshine,* 42 Ill.2d 508, 250 N.E.2d 152.) Mrs. Prendergast had been in the man's presence for approximately one-half hour. She had a better than adequate opportunity to observe his appearance. She gave a description that included his approximate age, height, weight, build, complexion, hair style, and clothing. The description apparently fit the defendant. The identification took place approximately 3½ hours after the robbery. And there is nothing in this record to indicate that the defendant's identification by Mrs. Prendergast was suggested by his clothing. Moreover, lineup identifications have been upheld where the defendant was the only person wearing an article of clothing similar to one worn by the person who had committed the crime. *People v. Bates,* 9 Ill.App.3d 882, 293 N.E.2d 358; *People v. Jones,* 7 Ill.App.3d 820, 288 N.E.2d 918; *People v. Shaw,* 6 Ill.App.3d 366, 286 N.E.2d 3.

■■ We must also reject the defendant's argument that the lineup procedure had been indelibly tainted by the fact that Mrs. Prendergast had been told the police had a "suspect." What person called to view a lineup would not conclude that the police had some idea an individual in the lineup might be the offender? Surely no one could reasonably imagine that the police were going to the trouble of bringing the witness down to view a group of people that they had gathered together indiscriminately and with no idea whatsoever of the possible involvement of any individual in the line. The same argument was raised and rejected in *People v. McMorris,* 17 Ill.App.3d 364, 367, 308 N.E.2d 291, and *People v. Del Genio,* 10 Ill.App.3d 437, 294 N.E.2d 78.

■■ In addition to the positive identification of Mrs. Prendergast, the

court had the benefit of a lineup photograph which substantially assisted "judicial appraisal of the integrity of the identification process." (*People v. Pierce*, 53 Ill.2d 130, 136, 290 N.E.2d 256.) For these reasons we conclude that the court did not err in permitting evidence of the lineup identification and the in-court identification of Mrs. Prendergast.

During the cross-examination of Officer Walsh, the following occurred:

"A. We took him right out. Officer Schwartz and I took him out.

Q. Put him in the car?

A. Yes, sir.

Q. Took him to the station?

A. Yes, sir.

Q. Did you wait for his clothes?

A. No, sir.

Q. Do you know who brought the clothes?

The Court: Well, Mr. Karlin [defense attorney], what difference does it make? You went over that once. Miss Martin said that the clothes were taken there by his wife. And what difference does it make who took him his clothes. He was taken out without clothes.

Mr. Karlin: There is one difference in the fact that the clothes were taken out by the police officers for identification. They picked those clothes that would fit the description.

The Court: Well, you can ask him if he did that.

Mr. Karlin: Did you pick out the clothes from the closet?

A. No, sir.

Q. Do you know who did?

A. No, sir."

The defendant now contends that the trial court's intervention constituted "fatal error." A trial judge is not a mere moderator or referee (*People v. Santucci*, 24 Ill.2d 93, 98, 180 N.E.2d 491); he has a wide discretion in controlling the proceedings before him. He may, of his own motion, exclude irrelevant matter and confine the trial to the issues. (*Peyton v. Village of Morgan Park*, 172 Ill. 102, 104-105, 49 N.E. 1003.) He is, of course, always subject to the requirements that he afford both sides the right reasonably to present their cases and that he refrain from adopting a partisan role. We judge that the trial court did not abuse its discretion by interjecting the questions as he did. The defendant did establish by his own witness that his clothes were brought to the police station by his wife. And it is clear from the officer's testimony before the court interrupted his cross-examination, that the officer did not himself take the clothes and was not in a position to know who did. The defendant testified that police officers went into his closet and removed a burgundy knit shirt, a blue jacket and a pair of boots. He contends that

if the police took the burgundy shirt, which was like the one worn by the robber, it would show a deliberate act on the part of the police that made the lineup suggestive. The answer to that contention is that the trial judge apparently did not believe that aspect of his testimony. The defendant now contends that the testimony that his wife brought the clothes to the station was hearsay. He did not take that position at the trial, as his own examination of his own witness discloses when his attorney examined his sister:

"Q. Do you know what they took?
A. They had this record player.
Q. Anything else?
A. That is all that I saw them take.
Q. I see. When did you next see Freddie?
A. Later on that evening when we went to the police station to take him a coat.
Q. Was Freddie furnished any clothing?
A. Well, Gwen [defendant's wife] took him a shirt and some underclothes when my mother got there."

■■ The defendant's final contention is that he was not proved guilty beyond a reasonable doubt. The only question in the evidence was the model of the car. Johnson testified that he wrote the make and model with the license number on a piece of paper. The police testified that the piece of paper had "1963 blue Buick Wildcat" on it. Johnson testified, not to what he put on the paper, but to his recollection of the make and model. His recollection was a light blue or green 1961 or 1962 Pontiac. However, he did identify a picture of the defendant's car, which was a 1963 Buick Wildcat, as the car he saw. The court found that the police version was correct. The only plausible explanation is that Johnson's trial recollection was incorrect. The positive identification of Mrs. Prendergast might be enough, standing alone; but, when added to her testimony are the identification of his car at the scene, and, most important, the stolen property in his room, we deem the proof overwhelming. For these reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE and GOLDBERG, JJ., concur.