THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TONY JACKSON, Defendant-Appellant.

First District (2nd Division)   No. 1—92—1645

Opinion filed July 27, 1993.

Robert W. Smith, of Hillside (Stuart K. Jones, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, Holly L. Rappin, and Susan Miller, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:
Defendant Tony Jackson was indicted for, among other offenses, first degree murder (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(1), (a)(2)) and unlawful use of a firearm by a felon (Ill. Rev. Stat. 1991, ch. 38, par. 24—1.1(a)). At his bench trial, the circuit court rejected defendant's defense of self-defense and defense of another, finding him guilty of second degree murder and unlawful use of a weapon by a felon. Defendant appeals, asserting that (1) the judge misapplied the law of self-defense when she refused to admit his testimony that his friend was scared; (2) the judge assumed the role of advocate for the State; and (3) the State failed to disprove his defense beyond a reasonable doubt. We affirm.

At trial,[1] Calvin Johnson was the State's first witness. He described himself as a professional gambler, explaining why he carries large sums of money and thus "do[es]n't go anywhere without anyone" even though he was also a professional boxer. A few days

[1]Defendant was tried concurrently with Tommie Harrison, who was charged with, among other things, attempted murder in connection with the shooting of another person at the same time.

prior to the shooting, defendant's friend, Dennis. Warren, had indicated that he wanted a gun, and Johnson later noticed that his handgun was missing. Johnson's brother told him that Warren had it, so Johnson made it known that he wanted to talk with Warren.

Johnson testified that on the evening of April 28, 1991, he, Bruce Jones, Johnnie Lee, Curtis Brown, and Christopher Wilson were at his apartment when Michael Ramsey arrived and told them Warren and defendant, whom Johnson had known all his life, wanted to see Johnson. Johnson and his companions followed Ramsey to the street, where they saw Warren and defendant, who were sitting on adjacent cars in front of a vacant lot on the north side of Lexington Street. Johnson had no weapon with him, and he never saw any of his companions with a weapon the entire evening.

Johnson asked Warren for his gun, but Warren, who was standing beside defendant, denied having it. Johnson then noticed a gun in defendant's pocket, and he asked to examine it. When defendant proffered the weapon, Johnson realized it was not his. Johnson then said to Warren, "Let me talk to you," and the two men walked into a vacant lot on the north side of the street. Johnson's companions and defendant stayed behind. Johnson again asked for his gun, and Warren again denied having it. Noticing that Warren's coat was wrapped tightly around his waist, Johnson grabbed at the coat, revealing a gun. It was not the missing weapon, but Johnson nevertheless seized it, unloaded it, and threw it five feet behind Warren. Meanwhile, defendant had remained by the car, but when Johnson grabbed Warren's arm and headed back toward Johnson's apartment, defendant approached carrying two guns, one of which was Johnson's missing weapon. He told Johnson to let Warren go. Johnson told defendant, "[T]hat's my gun right there. Just give me the gun and we are gone." He denied threatening to cut off Warren's wrists.

While defendant was trying to intervene, Jones too had come over to Johnson and Warren. He was not wearing black gloves and had no weapon. Jones, over 6 feet 4 inches and approximately 350 pounds, echoed Johnson, saying, "Punk, give me that gun." Defendant replied, "[D]on't walk up on me." Then, when Jones was within a foot or two of defendant, with his arms outstretched reaching for the gun, defendant fired, aiming first at Jones' chest. Defendant was firing both guns, at Johnson and at another person in Johnson's group. Other gunfire erupted. As defendant began shooting, Warren had picked up his gun and bullets.

Johnson fled northwest through the vacant lot and then went toward his house; he saw no one until he went around the block. Soon, an ambulance and police arrived at the scene of the shooting, but Johnson did not talk to them because he was unsure if the area was safe. He and the others got back to his apartment at about the same time, but the police arrived within seconds and arrested the lot, so there was little time to discuss the shooting among themselves. He gave the police a statement.

Ramsey and Brown testified much as Johnson did. Warren had asked Ramsey to tell Johnson to come alone to talk, and Brown testified that Ramsey told Johnson that Warren wanted to talk with him alone. After delivering his message, Ramsey and the others headed for a friend's house but saw Warren on Lexington Street; defendant was 20 feet away from Warren. The testimony of Wilson, a boxer, was substantially similar, though he testified that defendant ordered Johnson to get away from Warren.

Three police officers who had been to the scene also testified. Detective Kristen Kato arrived within 10 seconds of receiving a radio call that a man had been shot. The 10 or 15 bystanders pointed to Jones, whom Kato had known for several years. He was lying in the vacant lot, rocking and moaning. When Kato asked who had shot him, Jones replied "Little Tony," defendant's nickname. Kato saw no gloves or gun and touched nothing. The bystanders gave him no information. Officer Consuelo Morgan and her partner were the first police officers to arrive at the scene. Jones told her too that "Little Tony" shot him. She saw no gloves, no guns, and no other weapons near Jones. Unlike Kato, however, she noticed several live rounds of ammunition near Jones and several spent casings near the car and the sidewalk as well as by and near the vacant lot and under a car in the street. Albert Pribek, an evidence technician for the Chicago police department, took photographs of and evidence from the scene. He described the various casings and the point from which each was recovered, using photographs, including those taken from near a car in the street. He took swabs from Jones' palms and the backs of his hands to test for gunshot residue.

Robert Berk, a trace evidence analyst with the Chicago police department, testified as an expert in gunshot residue analysis. One of his tests was to brush a swab against the palm and back of each hand; in Jones' case, the left palm had more residue than the other three. Berk explained that one would have residue after shooting a gun or handling a recently discharged gun, so the results of his tests indicated that Jones had fired a weapon or handled a recently

discharged weapon, or had been in close proximity to a weapon when it was fired. If the latter, Berk estimated that Jones had been within a four-foot radius of a shooter, or within six feet straight ahead of the gun, depending on wind and other weather variables as well as type of bullet and type of firearm. If someone were standing with arms outstretched toward a shooter within a few feet, Berk stated, he would have residue unless he wore a leather glove. Berk agreed that if residue exists and a person puts on and takes off a glove, he will lose residue on that hand. Berk also agreed that a greater amount of residue on the left palm could result from that palm being closer to a shooter.

By stipulation, Dr. Ethel DiJanco, a medical examiner, testified that she performed the post-mortem examination of Jones, who had sustained one gunshot wound to the chest and a superficial one to the left thigh. He died of the chest wound, which resulted from a gun fired at close range. Jones' body had come with a black glove.

After the court found defendant not guilty on certain charges not relevant here, Larry Williams, an eyewitness and two- or three-year acquaintance of Johnson, Jones, and defendant, testified for defendant. He stated that defendant was backing up toward the street when Jones began to put on his right glove while talking to defendant and then drew a gun with his right hand before defendant drew his guns. Williams testified that he ducked away between two cars after he saw Jones fire, though he later said he did not know if Jones shot his gun. Williams neither saw defendant fire his guns nor observed Warren pick up a gun. After the shooting stopped, Williams stood up and saw a man, whom he could not identify, pick a gun up from the vacant lot and run away. He believed it was Jones' gun, which had fallen next to Jones' hand. He was familiar with Johnson's reputation in the community, which, like Jones', was for violence. He did not know defendant's reputation. Williams also said that after taking the gun from Warren, Johnson had put it in his pants.

Defendant, who is 5 feet 9 inches and weighs approximately 135 pounds, testified in his own defense. In talking with neighbors since 1985, defendant learned that Jones and Johnson had like reputations: "very violent." On the day in question, defendant and Warren were sitting in a car parked on the north side of Lexington Street in front of the vacant lot when he saw Johnson and his bodyguards approaching from the south. When Johnson asked Warren for his gun, Warren replied that he did not have it. Johnson then grabbed Warren's arm and shoved him north from the sidewalk to the va-

cant lot. Defendant moved to about 10 feet north of Johnson and Warren, with Jones to his left and Johnson and Warren to his right. The others were fanned out around him except Wilson, who held a gun and was in the street behind the car. In his waistband, Johnson too had a gun, which defendant did not see until Johnson disarmed Warren. After throwing Warren's weapon to the ground, Johnson ordered his bodyguards to "[t]ake [Warren] and cut his arms off." Johnson then grabbed Warren and began trying to force him to move south toward his apartment. At this point, defendant pulled his guns and pointed them at Johnson, telling Johnson that he was not going to take Warren anywhere. Johnson released Warren, who then picked up his gun and began to reload it. To protect himself and Warren, defendant was pointing one of his guns at Johnson, who he knew was armed.

Jones then approached on defendant's left, saying, "Fuck this shit, whatever y'all want to do we can do it." Defendant replied, "Stop, don't come up on me," but Jones continued to move closer. When Jones said, "What the fuck you gon' do with that gun," defendant again warned him to halt. Jones did not. Defendant did not see a gun in Jones' hand, though he presumed the others had guns. Finally, when defendant had one gun pointed at Johnson and the other at Jones, who was only three feet away, he heard two shots from the direction of the car; he did not know who had fired them. Defendant then fired twice at Jones, who was closest, because he feared that Jones would try to disarm him or kill him and Warren. The shells ejected to the right and back, about two or three feet away.

The court found that "certain factors *** ha[d] been established without question": Johnson took the gun from Warren, unloaded it, and dropped the bullets and gun on the ground; defendant shot Jones without knowing if he had a gun; and Jones was dead. The court concluded that it did not believe that defendant's conduct was reasonable, finding specifically that he had acted "under the unreasonable belief that he had a right to shoot and kill someone even though in his own words he does not know to this day whether or not that person was armed." The court further commented that it did not believe defendant's testimony on certain points. The court also determined that the defense failed because Warren had been able to pick up, load, and shoot the gun Johnson had taken from him, so the harm was not imminent. The court then found defendant guilty of murder in the second degree and of unlawful use of a weapon, and it sentenced him to 12 years' imprisonment.

In his motion for a new trial, defendant raised only one issue: sufficiency of the evidence.

## I

Defendant insists that when considering a self-defense question, all surrounding circumstances are relevant in determining whether a defendant reasonably believed that he was in danger of great bodily harm or death, so the court erred in stating that one surrounding circumstance, *i.e.*, whether Warren was scared, was irrelevant to defendant's case. In defendant's view, his belief about Warren's fear after Johnson's threat to cut off his arms was relevant to whether defendant reasonably believed that Warren was in danger, which in turn would bear on the reasonableness of his action in going to Warren's defense and on the degree of force required to save Warren. If defendant thought Warren was scared, defendant argues, that fact would make defendant's conduct more reasonable.

■ Certainly, a witness may testify that another person was scared if the fact is relevant. As one court has said, a statement like this is just a "shorthand" rendition of facts observed. (*Hackett v. State* (1981), 2 Ark. App. 228, 230-31, 619 S.W.2d 687, 689; see also *People v. Peter* (1991), 220 Ill. App. 3d 626, 630-31, 581 N.E.2d 128, 131 (witness permitted to testify that the defendant displayed a "momentary look of panic" because facial expressions are "difficult, if not impossible, to explain or reproduce, and we are generally accustomed to, and capable of, understanding and interpreting such expressions in our everyday life"); *State v. Hopper* (1905), 114 La. 557, 558, 38 So. 452, 452 (Appearance is a fact, and such testimony "[e]ven in so far as to some extent calling for an opinion—as, for instance, that the [defendant] looked scared— *** was unobjectionable. The opinion of nonexpert witnesses is admissible on a great variety of subjects"); *Peterson v. Seattle Traction Co.* (1900), 23 Wash. 615, 642, 63 P. 539, 548 (witnesses may say: " 'He seemed to be frightened,' 'He was greatly excited,' 'He was much confused,' 'He was agitated,' 'He was pleased,' 'He was angry.' All these emotions are expressed to the observer by appearances of the countenance, the eye, and the general manner and bearing of the individual, appearance[s] which are plainly recognized ***").) Thus, we disagree with the circuit court's apparent belief that a witness may not testify that another person is scared.

Nevertheless, to be admissible, evidence must be relevant, that is, it must have a tendency "to make the existence of any material fact more probable or less probable than it would be without the ev-

idence." (*People v. Free* (1983), 94 Ill. 2d 378, 415, 447 N.E.2d 218, 236.) One of the elements of the defense of self-defense is a defendant's "reasonabl[e] belie[f] that [deadly] force [or force intended or likely to cause great bodily harm was] necessary to prevent imminent death or great bodily harm to himself or another." (Ill. Rev. Stat. 1991, ch. 38, par. 7—1.) Defendant asserts that Warren's fear would make more likely the reasonableness of his own belief in the need for deadly force in the face of imminent harm, but his argument fails to persuade. Warren's assessment of the danger simply had no bearing on the reasonableness of defendant's belief in the need for deadly force, for defendant's belief could have been found reasonable even if Warren had been unconscious or otherwise unaware of any danger. Likewise, Warren's fear carries no weight when determining the reasonableness of defendant's assessment of the gravity and immediacy of the danger, for defendant might not have shared his belief. Consequently, we hold that this testimony was properly excluded at trial, albeit for a reason different from the circuit court's ruling.

## II

Defendant claims that the trial judge was biased in favor of the State, thereby denying him a fair trial. As evidence of this bias, he cites a number of instances in which the judge made spontaneous objections, in fact and in effect, to defense counsel's questions. The "first and most egregious" example, he begins, occurred when the judge asked for objections as defense counsel tried to elicit Williams' testimony about Johnson's reputation for violence.[2] She also quizzed Williams about his eyesight, thereby "engaging in bald cross-examination *** that severely discredited [the witness'] professed ability to perceive the events leading

---

[2]"Q. [Defense Attorney:] Mr. Williams, how long have you been hanging around that neighborhood?

A. I was born and raised over there. I have been up there for years.

Q. And how long have you known Calvin Johnson?

A. I really, don't really know him. I just seen him. Maybe about two years now that I just know of him.

Q. During all the time that you have been hanging around that neighborhood, have you had an opportunity to discuss, have you had an opportunity to engage in conversations with people who are from that neighborhood regarding Calvin Johnson's reputation for violence or peacefulness in a community?

A. Ain't no peacefulness.

THE COURT: *Excuse me for one moment, but there's no objection to this?*

[Assistant State's Attorney]: We'll object." (Emphasis added.)

up to the shooting," that is, Jones' donning the gloves and pulling a gun.[3] In addition, defendant argues, the court cut off defense counsel

---

[3]"THE WITNESS: I need my glasses.

THE COURT: He can't really see it. Do you wear glasses?

THE WITNESS: Yes, ma'am.

THE COURT: For reading.

THE WITNESS: Yes, ma'am, and I'm nearsighted.

THE COURT: You have the glasses? Nearsighted is when you can't see far.

THE WITNESS: I can't see things like when they are blurry.

Could I stand here and look at [the board]?

THE COURT: Yes.

\*\*\*

[Assistant State's Attorney]: And let me guess, sir, would it be fair to say, as today, you didn't have your glasses on [during the shooting]?

A. Don't need glasses to see a pistol. To read something, yes, or a billboard or something, but not to see a gun.

Q. I see.

A. I need glasses, but not that bad, sir.

Q. I got you. Now, let me ask you this, sir.

After you saw or heard the shooting, you talked to the police?

A. Yes, I did.

Q. And do you remember telling the police you were there to help the police about this incident, right.

A. No, I was not there to help them. I was just there when they picked him up over there and everything, and they came and asked who saw it. I said I was standing over here, and he asked me what did I see.

THE COURT: You have difficulty seeing things for [sic] away, or things that are close to you?

THE WITNESS: I have difficulty reading things. When they are far away, they are blurry to me.

Things that's far away, reading only, but a human being, I'm quite able to see a human being from the distance I was.

THE COURT: *Well, do you have difficulty seeing things in a distance, or is it your eye problem that you can't see things close up, or do you have a general overall vision problem where you need glasses basically for everything?*

THE WITNESS: No. I don't need glasses for reading, for things that's near. Things that's far away is blurry to me. I need glasses for things far away from me.

THE COURT: All right. So, how far were all these people from you?

THE WITNESS: Just like I said, maybe a little farther than the court door[, which was at least 50 or 60 feet away].

THE COURT: *And you don't consider that far away?*

THE WITNESS: No, ma'am.

THE COURT: All right. You may continue." (Emphasis added.)

repeatedly when examining witnesses[4] and spontaneously limited his re-cross-examination.[5]

In what defendant describes as "[t]he judge's most blatant and shameless venture into the role of prosecutor," the court cued the prosecutor to object to the lack of a foundation for Johnson's testimony about the gloves when it intervened during defense counsel's cross-examination of Johnson after defense counsel elicited without objection by the State that each of Johnson's companions had no gun.[6] Defendant characterizes this as "tantamount to interposing her own objection" and as "overtly prompt[ing] the State, in effect, to wake up and start objecting to evidence that she thought was inadmissible."

---

[4]As explained in Part I, when defense counsel was examining defendant concerning Warren's appearance and state of mind when the gun was taken from him, defendant replied that Warren was scared. The State objected and the court sustained the objection. As defense counsel began to resume his questioning, the following occurred:

"[Defense Counsel]: Well tell me—

THE COURT: How about if we just go to what happened. That would be—Could we hear about that? Just what happened out there.

[Defense counsel asks for a sidebar; defendant leaves stand temporarily.]

[Defense Counsel]: Judge, several times during cross-examination of witnesses you've asked me and [codefendant's counsel] ['A]re you finished yet, are you finished yet, any more questions[,'] and on each of those occasions we stopped our questioning. Even though we had a lot of questions left and I *** I don't know exactly how to—When you do that that sends a signal and it tells me to stop, and I mean, as you know—

THE COURT: I'm not telling you to stop but for [defendant] to sit here and say that [Warren] looked scared is improper. They objected and I sustained the objection.

***

THE COURT: All right. I mean I'm not trying to cut you off. It's just that, you know, we have spent many hours on this case and we can spend many more, but I'm just asking you to move on. I don't think that's improper. And from now on you can ask any question you want. Okay. I'll let you go forever if you think I've been cutting you off. I haven't been. I don't need to."

[5]The court asked "Could we just confine ourselves to the redirect," which defendant claims was in effect the judge's *sua sponte* objection to questions beyond the scope of re lirect even though the State made no such objection.

[6]The court commented:

"No one has objected to some of the things that have already been testified to, but I don't think [the witness is] in a position to testify as far as whether any of the other people had guns. As far as I'm concerned, that's not evidence. His statement that no one had guns—these other people did not have

Defendant also claims, without citing support, that this evidence in fact was admissible, "although the judge could give it less weight because no foundation had been laid for the witness's knowledge." Indicative that the judge was not merely prone to active participation at trial, defendant maintains, is that the court made no similar spontaneous objections against the State, *e.g.*, to admission of Kato's conversation with Jones without foundation for application of the dying declaration exception to the hearsay rule. Defendant concedes that each action was perhaps harmless individually, but he insists that they are cumulatively reversible.

■ As noted above, defendant objected to only one of these incidents. Although generally a defendant waives his right to challenge an alleged error unless preserved by both an objection at trial and inclusion in a post-trial motion, he may invoke the plain error rule (134 Ill. 2d R. 615) if the evidence was closely balanced or was of such constitutional magnitude that defendant was denied a fair trial. (*People v. Speight* (1992), 153 Ill. 2d 365, 379, 606 N.E.2d 1174, 1180.) Bias in a judge is one of the few trial "errors" that may not be deemed harmless. (*Arizona v. Fulminante* (1991), 499 U.S. 279, 309, 113 L. Ed. 2d 302, 331, 111 S. Ct. 1246, 1265 (a biased judge is a "structural defect[ ] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards," citing *Tumey v. Ohio* (1927), 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437, and likening judicial bias to deprivation of counsel at trial, unlawful exclusion of members of a defendant's race from grand jury, right to public trial, and right to self-representation at trial (not harmless), while distinguishing admission of involuntary confession (harmless)).) Moreover, the waiver rule is less rigidly applied when the conduct of a judge herself is the basis for the appeal. (*People v. White* (1993), 249 Ill. App. 3d 57, 60, citing *People v. Davilla* (1992), 236 Ill. App. 3d 367, 379, 603 N.E.2d 666, *cert. denied* (1993), \_\_\_ U.S. \_\_\_, 125 L. Ed. 2d 700, 113 S. Ct.

---

guns is not evidence unless it's brought out he went through some systematic frisking and searching all the people with him to make his own determination that none of the people with him had guns. As far as I'm concerned, that's not evidence. I'm not considering it.

As far as whether anybody else had gloves, again this is not something within this person's actual knowledge until otherwise established. So it's not evidence. It's not evidence at this point that nobody else had guns because there's been no foundation to show that [Johnson] can testify for anyone else accept [*sic*] himself and not what he saw on the street."

3009.) We therefore reject the State's urging that we hold that defendant waived this issue.

To warrant reversal on the ground of bias, however, a defendant must demonstrate that "there was active personal animosity, hostility, ill will or distrust toward [him] and, absent such a showing, a court will not conclude that there was actual prejudice which prevented or interfered with a fair hearing." (*People v. Johnson* (1990), 199 Ill. App. 3d 798, 806, 557 N.E.2d 565, 570.) Defendant has pointed to nothing in the record that would support such a particularized finding.

Rather than individual bias, it seems, the gist of defendant's claim is that the court assumed the role of advocate for the State by questioning the witnesses and objecting *sua sponte* to certain testimony. Such conduct is not *per se* improper, however, for judges have discretion to question witnesses to clarify obscure matters and elicit the truth, so long as they remain fair and impartial and show no bias or prejudice. (*White*, 249 Ill. App. 3d at 61; *People v. Murray* (1990), 194 Ill. App. 3d 653, 658, 551 N.E.2d 283, 286-87 (judge abuses discretion by assuming role of advocate while questioning, but propriety of questioning is decided case by case, especially at bench trial, where there is less chance of prejudice to defendant); see also *People v. Trefonas* (1956), 9 Ill. 2d 92, 100, 136 N.E.2d 817, 821 (questioning permitted to clear up contradictions between defendants' signed statements and their testimony); *People v. Marino* (1953), 414 Ill. 445, 451, 111 N.E.2d 534, 537 (coupled with comments implying disbelief, "extensive sharp questioning" conveyed to jury that witness was unworthy of belief).) This discretion is not absolute, however. *People v. Moriarity* (1966), 33 Ill. 2d 606, 213 N.E.2d 516 (when prosecutor faltered on direct examination of complainant, court improperly stepped in to ask the critical questions); *People v. Santucci* (1962), 24 Ill. 2d 93, 180 N.E.2d 491 (judge's questions to State's witnesses improperly emphasized testimony detrimental to the defendant).

Here, the court appears to have been genuinely confused about the type of correction Williams' eyes needed and about what he considered to be a "far" distance. The record makes plain that it was this uncertainty that prompted its questions to Williams to expand on his explanations about his eyesight and to compare distances in the courtroom with distances between him and the shooting. Thus, those questions cannot be held an abuse of discretion. Similarly, telling defense counsel to "move it," though inartfully phrased, is not necessarily a show of partiality toward the State.

(*People v. Perry* (1989), 183 Ill. App. 3d 534, 546, 540 N.E.2d 379, 387 ("How much longer do you have to go" and "[w]here is the impeach[ment]" during cross-examination not improper and defense counsel was able to make his points), *appeal denied* (1989), 127 Ill. 2d 633, 545 N.E.2d 124.) Too, any error that might have occurred when the State was allowed to present Jones' statement that defendant shot him would be harmless, for defendant admitted that he had done so.

As for the judge's *sua sponte* objections and exclusion of evidence, a judge is not a mere referee, and she has wide discretion to control the course of the trial. (*People v. Martin* (1974), 24 Ill. App. 3d 710, 716, 321 N.E.2d 368, 373.) Moreover,

> " '[i]t is the judge's duty to see that justice is done, and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry has not been pursued it is his duty to interpose and either by suggestions to counsel or an examination conducted by himself avoid the miscarriage of justice ***.' " (*People v. Franceschini* (1960), 20 Ill. 2d 126, 132, 169 N.E.2d 244, 247, quoting *People v. Lurie* (1917), 276 Ill. 630, 641, 115 N.E. 130, 134.)

We believe that the court followed these precepts and did not abuse its discretion in refusing to admit certain testimony even though the State had not objected to it. In *Martin*, for example, the court found nothing wrong in the judge's decision to exclude irrelevant matters even though there had been no objection. Likewise here, the court had the power to refuse on its own to take into account irrelevant evidence.

Even if the court's conduct were improper, reversal would be warranted only if the court's conduct played a material role in defendant's conviction or prejudiced him. (*People v. Enoch* (1989), 189 Ill. App. 3d 535, 543, 545 N.E.2d 429, 436, *appeal denied* (1990), 129 Ill. 2d 567, 550 N.E.2d 561.) We note that given that this was a bench trial, prejudice was far less likely to result. (*People v. Griffin* (1990), 194 Ill. App. 3d 286, 296, 550 N.E.2d 1244, 1250.) More importantly, however, Williams eventually did testify about Johnson's reputation for violence, so no prejudice could have resulted from the court's involvement in this area of inquiry. Furthermore, although defendant claims that the court's cutting him off prejudiced him, he made no offer of proof at trial (or on appeal) of the questions he claims he was prevented from asking. Similarly, he is unable to demonstrate how, had the court admitted any of the other evidence he claims was improperly excluded, the State's case

would have failed. Thus, we conclude that the court's *sua sponte* participation constituted no error.

## III

When a criminal defendant challenges the result of a trial on the ground of insufficient evidence, he has a heavy burden, for he cannot prevail if this court finds that " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Defendant claims that the State did not disprove beyond a reasonable doubt that (1) force was threatened against him or Warren; (2) he was not the aggressor; (3) danger of harm to him or Warren was imminent; (4) the force threatened was unlawful; (5) he actually believed that (a) the danger existed, (b) use of force was necessary to avert the danger, and (c) the kind and amount of force used was necessary; and (6) these beliefs were reasonable, citing *People v. Henry* (1980), 86 Ill. App. 3d 602, 408 N.E.2d 228. The test, he asserts, is what a defendant, as a reasonable person, believed under the circumstances, not what a fact finder thinks a reasonable person would believe, even if the defendant was mistaken as to the danger. Here, the evidence showed that Johnson threatened to use force against Warren when he said "cut off his arms" and Jones threatened defendant with force when he continued to approach him. Defendant claims that Jones' conduct was an indirect threat of force against Warren as well, for Warren would have been helpless if defendant had been disarmed. Johnson and his band were obviously the aggressors, defendant continues, having come up to defendant and Warren intending to repossess Johnson's stolen gun, not to mention Johnson's shoving Warren and stripping him of a gun as well as Jones' threats while approaching defendant. The danger of death or grave harm to himself and Warren was imminent, defendant contends, given Jones' proximity and Wilson's shots. Furthermore, defendant testified that he actually believed that the danger existed and that use of deadly force was necessary to avert the danger, for he thought that Jones, a very large man with a violent reputation, was going to disarm him, leaving him helpless before Johnson's gang, and then kill him and Warren. It matters not if Jones had no weapon, defendant contends, because

even use of fists by a decedent can justify use of deadly force. Under these circumstances, defendant concludes, his beliefs were reasonable.

■ Here, the court found that defendant's belief in the need for deadly force was unreasonable because the threat of harm to defendant and Warren was neither imminent, given that Warren had time to pick up his gun and load it, nor deadly, given that defendant only presumed that Jones was armed. From the evidence adduced at trial, including Warren's ability to reload his gun and defendant's own admission that he did not know if Jones had a gun, any rational trier of fact could have found both these facts to be true beyond a reasonable doubt. Thus, the State satisfied its burden of proof. *People v. Hooker* (1993), 249 Ill. App. 3d 394, 400 (State meets its burden if able to disprove beyond a reasonable doubt even one of the elements of self-defense).

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

McCORMICK, P.J., and SCARIANO, J., concur.