NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241294-U

NOS. 4-24-1294, 4-24-1295 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 27, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Ogle County |
| JAMES S. CLEVENGER III | ) | Nos. 21CF146 |
| Defendant-Appellant. | ) | 22CF111 |
| | ) | |
| | ) | Honorable |
| | ) | John B. Roe IV, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, concluding (1) defendant's guilt was proven beyond a reasonable doubt on all six counts of criminal sexual assault, (2) the State did not err in mentioning the store receipt during closing arguments, and (3) there was no error in admitting the victim's statements to a nurse regarding her sexual assault. Thus, defendant was not denied his right to a fair trial.

¶ 2   Following a bench trial, defendant, James S. Clevenger III, was convicted of six counts of criminal sexual assault and one count of domestic battery. 720 ILCS 5/11-1.20(a)(1); (West 2020); 720 ILCS 5/12-3.2(a)(2) (West 2020). On appeal, defendant argues the trial court erred in (1) finding him guilty beyond a reasonable doubt on six counts of criminal sexual assault, (2) allowing the State to use a receipt as substantive evidence in its closing argument and improperly considering the receipt as substantive evidence regarding defendant's guilt, despite it being admitted for a limited purpose, and (3) admitting the victim's statements to a nurse

regarding defendant's alleged sexual assaults. Defendant further contends the cumulative effect of those errors denied him a fair trial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Charges

¶ 5          The charges in this case stemmed from incidents that happened while defendant was residing with Christine G. and her 13-year-old child, K.C. The three of them lived together for approximately two years in a small ranch house with two bedrooms and one bathroom. Christine and K.C. slept in the bedrooms, and defendant slept on the couch. On June 28, 2021, while K.C. and defendant were in the kitchen, defendant came behind K.C. to retrieve something from a cabinet, put his right hand on her right butt cheek, and began rubbing it. Christine walked into the kitchen, observed what defendant was doing, and demanded he leave the house immediately. That same day, Christine took K.C. to the Oregon Police Station, where K.C. was interviewed and gave a written statement describing the incident. Two days later, K.C. was interviewed at a local child advocacy center. She described the incident in the kitchen and stated it was a shock to her because nothing like it had happened previously.

¶ 6          Defendant was charged by information in July 2021 in Ogle County case No. 21-CF-146 with one count of aggravated criminal sexual abuse (*id.* § 11-1.60(d)) and one count of presence within a school zone by a child sex offender (*id.* § 11-9.3(b-5)). The aggravated criminal sexual abuse count was dismissed after the State conceded the touching of a 13-year-olds's buttocks was not sexual conduct as defined in the Criminal Code of 2012. In December 2021, the State filed a new charge of domestic battery based on the same allegations. *Id.* § 12-3.2(a)(2).

¶ 7          An Illinois Supreme Court Rule 402(d) (eff. July 1, 2012) conference was held on

the two pending charges, wherein a plea agreement with the possibility of probation was discussed. Within days of the Rule 402(d) conference, K.C. made a new disclosure that defendant had sexually assaulted her six times between March and June 2021. In May 2022, defendant was charged in a new case (Ogle County case No. 22-CF-111) with six counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2020)), which were Class X felonies due to defendant's previous criminal sexual assault convictions.

¶ 8 Thereafter, the trial court consolidated the criminal sexual assault and domestic battery charges in the present case, and the remaining charge regarding defendant's presence in a school zone was adjudicated separately.

¶ 9         B. Motions *in Limine*

¶ 10 The State filed a number of motions *in limine* in this case. Pertinent to this appeal, the State's "Motion *in Limine* No. 4," sought admission of defendant's mail and a Meijer receipt found amongst his leftover possessions in Christine's garage. The receipt listed purchases for condoms and a sex toy. At a hearing on the motion, the State argued it sought to admit the receipt into evidence to establish defendant's intention to engage in sexual activity with K.C. The State contended the receipt was not hearsay pursuant to *People v. Neal*, 2020 IL App (4th) 170869, where the appellate court concluded a receipt or any implied assertions within it were not hearsay. Defense counsel objected to the sex toy purchase listed on the receipt being admitted as evidence, arguing there were too many inferences being made from it. In its November 2023 order and memorandum, the trial court granted the State's motion. The court reasoned because the receipt was found with defendant's possessions, specifically, among his mail, it did nothing more than corroborate testimony defendant had resided at Christine's address. Furthermore, the court reasoned in *Neal*, the appellate court held that unopened mail

- 3 -

addressed to a defendant was not hearsay and that implied assertions of fact contained within the mail are not hearsay.

¶ 11 The State also filed "Motion *in Limine* No. 2," which sought to allow the nurse who examined K.C. in 2022 to testify to specific statements K.C. made to her during the examination. Specifically, the State sought to allow K.C.'s statements that when defendant "had sex with her she felt pain in her vagina" but did not have any bleeding, defendant had anal sex with her and she "had diarrhea with blood for about a day afterward," and defendant "never used a condom and would ejaculate in [K.C.]" The State maintained these statements were admissible under section 115-13 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-13 (West 2022)) and Illinois Rule of Evidence 803(4) (eff. Mar. 24, 2022) because they were statements made by a victim to medical personnel for purposes of medical diagnosis and treatment, and thus, they were not barred by the rule against hearsay. During the hearing on the motion, the State's argument reflected its filed motion, contending K.C.'s statements were admissible as an exception to the hearsay rule. In response, defense counsel argued the rules the State cited were exceptions meant to be narrowly construed and the State needed to establish more than just statements being made to a nurse for some "conclusory position that [the examination] was done for the purpose of medical diagnosis." In addition, defense counsel argued K.C.'s examination by the nurse was more akin to a forensic interview, where the sole purpose was to get incriminating statements, which was not under the "heart or the nature" of the statute or an exception to hearsay as the State contended. In the alternative, defense counsel argued the probative value of such statements was greatly outweighed by the prejudicial effect, which would result in an unfair trial for defendant if the statements were admitted. In its November 2023 order and memorandum, the trial court granted the State's motion. The court reasoned the

- 4 -

nurse learned of the details of K.C.'s sexual assault while performing an "on the record medical examination" and "did not happen upon this information and use her position as a nurse to report the abuse." The court further explained K.C.'s statements to the nurse were answers to why she was experiencing pain. Consequently, the statements made by K.C. to the nurse were in furtherance of a medical examination and thus fell under the exceptions to hearsay provided by the law.

¶ 12                                C. The Trial

¶ 13       Defendant elected to waive his right to a jury trial, and the matter proceeded to a bench trial. The following is a summary of the relevant evidence presented at trial.

¶ 14                              1. *The State's Case*

¶ 15                              a. Testimony of K.C.

¶ 16       K.C., who was 16 years old at the time of trial, testified she lived with her mother, Christine, in a two-bedroom ranch home in Oregon, Illinois. Around 2020, defendant moved in with them and slept in their living room. At that time, defendant owned two horses, and K.C. would ride with him. From time to time, they also worked together on his tractor or vehicles.

¶ 17       K.C. testified during the summer of 2021, she was 13 years old, in the seventh grade, and had a part-time job at Horizon View Farms, where defendant's horse, Magnum, was boarded. She began working there to work off the cost of Magnum's boarding fee. K.C. acknowledged Magnum was very important to her and she was very upset when defendant later sold Magnum without telling her.

¶ 18       K.C. recalled an incident that occurred in her kitchen on June 28, 2021. K.C. stated, while she and defendant were in the kitchen, he "started grooming [her] right butt cheek" and "had his hand *** just going up and down" over her clothes. K.C. recalled she was wearing

- 5 -

jeans, slippers or socks, and a hoodie. K.C. did not give defendant permission to do this, she was in "too much *** shock and discomfort" to say anything in the moment, and defendant did not say anything to her. Christine came into the kitchen, saw what was happening, and "started screaming" and telling defendant to "get the F out of [her] house." Photographic exhibits admitted at trial show the kitchen was a narrow galley style, with cabinets on both sides.

¶ 19 K.C. further testified on Sundays in the summer of 2021, she and Christine would go to church, and sometimes defendant would join them. Christine's routine before church consisted of showering and fixing her hair in the bathroom. On some of those Sundays, while Christine was preparing for church, defendant would force K.C. to have sex with him. K.C. testified she would walk by defendant in the living room, "he would reach over *** to grab [her,] and then he would just push [her] over to the love seat." Defendant would "force [K.C.] to have sex" "in [her] living room on [the] little love seat, couch." K.C. specified defendant "would set [her] down, tie [her] down and he would do his thing." Defendant would sometimes tie K.C.'s feet and hands, or he would hold them and he would "sometimes put his hand over [her] mouth." Defendant used a "lead rope or rope of some sort," would "stick his penis into [K.C.'s] vagina," and would "sometimes finish in [her]." K.C. admitted she probably could have yelled but never did, as she was too scared. In total, K.C. recalled defendant sexually assaulted her six times and only used a condom once or twice. None of these encounters were witnessed by Christine . K.C. testified she never consented to any of the conduct and felt "[v]ery uncomfortable" and scared when it happened. K.C. also testified defendant bought her thong underwear and a sex toy when she was 13 or 14 years old.

¶ 20 During cross-examination, K.C. admitted in her first interview, she told a school resource officer only about defendant rubbing her buttocks in the kitchen, with no mention of

other incidents. When asked by police if defendant had bought her anything, she initially only mentioned the jeans she was wearing, omitting the sex toy and thong underwear. K.C. confirmed that her written statement to the police did not mention other sexual assaults, a sex toy, or underwear. A few days later, she met with a counselor at the Shining Star Child Advocacy Center (Shining Star), where she had multiple interviews. During these interviews, K.C. did not mention the other incidents involving defendant, the sex toy, or the underwear, and she denied any occurrences with defendant apart from the kitchen incident.

¶ 21                                    b. Testimony of Christine

¶ 22            Christine testified she initially met defendant online when she purchased a horse-riding helmet from him. They became friends, and Christine cared for defendant's mother toward the end of her life. Defendant eventually moved into Christine's home as a roommate, sleeping on the living room couch. Christine never had a romantic relationship with defendant during the two years they were living together. After defendant moved in, he installed security cameras on the garage door and front porch and a baby monitor in both the front window and the back room.

¶ 23            Regarding the June 28, 2021, incident in the kitchen, Christine recalled she had left for her morning school bus route, returned home mid-morning, and began doing housework. Christine walked into the kitchen and saw defendant rubbing his hand over K.C.'s buttocks. Christine yelled, "Oh, hell no," while defendant stated, "[I]t's not what it looks like." Christine told him to get out. Christine and K.C. left the house before defendant, and when they returned, defendant was gone.

¶ 24            Later that summer, Christine found an empty sex toy box and thong underwear in K.C.'s room. They did not belong to Christine and she did not buy them for K.C. She was aware

K.C. had thong underwear because she saw it in the laundry before, but she never purchased that type of underwear for her. She also testified defendant told her K.C. should be more "covered up," referring to the way she dressed. Although Christine never witnessed it, defendant told her K.C. would take different clothing to change into after leaving for school. Christine admitted defendant did not talk about sex with her, but he would discuss sex with K.C.

¶ 25 Christine testified, during the summer of 2021, she would attend church on Sunday mornings with K.C. and defendant. Her routine consisted of getting ready in the bathroom for 30 to 45 minutes while K.C. and defendant were in the home.

¶ 26 Christine further testified that after she kicked defendant out, she found his mail along with a clip of receipts on a desk in the garage. She gave police a receipt from Meijer dated June 27, 2021, the day before the kitchen incident, that listed purchases of condoms and a sex toy.

¶ 27 On cross-examination, Christine acknowledged she had asked defendant to move out prior to the kitchen incident, but she never started the eviction process. She also admitted, in the days leading to the kitchen incident, K.C. was upset with defendant because he sold Magnum without telling her, even though K.C. had been regularly caring for Magnum as her own.

¶ 28 c. Testimony of Heather Sharp

¶ 29 Heather Sharp, a pediatric nurse with Medical Evaluation Response Initiative Team (MERIT), testified she handles referrals from law enforcement, medical teams, and child advocacy centers for medical examinations on children suspected of experiencing physical or sexual abuse. She is also a certified pediatric nurse practitioner and a sexual assault nurse examiner for pediatrics (SANE-P), working with children from 0 to 17 years of age. Over objection, the trial court allowed her to testify as an expert.

- 8 -

¶ 30     In April 2022, K.C. was referred to MERIT by Shining Star due to suspected sexual abuse. Sharp initially met with K.C. and Christine. In accordance with her customary practice, Sharp conducted a physical examination of K.C. outside of the presence of Christine to see if there were any medical exam findings based on K.C.'s disclosure of abuse. During the examination, K.C. disclosed she was sexually assaulted by defendant, who was a family friend, no condom was used, and he ejaculated inside her. During the first sexual assault, "she had pain in her vaginal area." K.C. divulged her fourth sexual assault was anal intercourse, which caused pain "in her rectum" and "bloody diarrhea for about a day after that."

¶ 31     According to Sharp, K.C.'s exam was normal, meaning K.C.'s body did not exhibit abnormalities indicative of sexual assault. She explained, because the exam occurred 10 months after the suspected abuse, normal findings on the exam did not rule out any kind of physical or sexual abuse. The time between the assaults and the exam would have given K.C. time to heal. In fact, Sharp indicated she did not anticipate finding signs of abuse, but she explained the medical exams serve multiple purposes, including checking for sexually transmitted diseases and allowing "children to understand that their bodies are healthy and normal even though something may have happened to them."

¶ 32                    d. Testimony of Deputy Joshua Lee

¶ 33     Deputy Joshua Lee of the Ogle County Sheriff's Office investigated defendant's case in 2021, when he was serving as a sergeant and investigator with the Oregon Police Department. During his investigation, Deputy Lee obtained a search warrant for defendant's cell phone. When Deputy Lee met with defendant to confiscate his cell phone, defendant asked if he could retrieve some contact information before turning it over. Deputy Lee allowed him to do so, but he saw defendant appear to delete information, including the YouTube application, so he

took the cell phone from defendant. Thereafter, during his search of defendant's cell phone, Deputy Lee found Daybook, a journaling application, where defendant had made a variety of entries. Deputy Lee saw "several notes in there that [he] thought were a little odd about [K.C.] or her friends." The search of defendant's cell phone also uncovered evidence defendant had either watched or clicked on videos titled, "Nudist teens ride horses naked in the wilderness," and, "Hot babes riding horses naked sexy videos." Defendant's cell phone also contained images of K.C. on the front steps of her home that appeared to have been still images from a home security camera.

¶ 34        At trial, Deputy Lee testified about the screenshots on defendant's cell phone, as well as some of the Daybook entries ranging from March 2020 through July 4, 2021. A Daybook entry from March 1, 2020, said, "Giving [K.C.] another start so I'll have to see what happens. I have my doubts." An entry in April 2020 read, "Yesterday [K.C.] told me her deep feelings." In April 2021, an entry read, "2nd day taking that ignite [pill] dick feels like it's responding." On June 23, 2021, an entry read "I told [K.C.] to be with [her boyfriend], she is even dressing lile [*sic*] him. There hasn't been a note in a long time." On June 27, 2021, an entry read "Bought [K.C.] a vibrator today for her pussy she already used it." On June 28, 2021, the day of the kitchen incident, an entry read, "Well what a mess I got my[self] into." The last entry presented was dated July 4, 2021, and read, "watching movie clip Almost teen porn."

¶ 35                    2. *Defendant's Case*

¶ 36                    a. Testimony of Jose Mario Pacheco

¶ 37        Jose Mario Pacheco, owner of Horizon View Farms, testified he became familiar with defendant in 2020, after he came to the farm to inquire about boarding Magnum. In 2021, defendant was having difficulty paying the boarding fees and arranged with Pacheco to allow

- 10 -

K.C. to work on the farm to cover boarding costs. Pacheco testified the arrangement fell through in May 2021 after only three weeks because "things were not getting done properly." Defendant sold Magnum shortly thereafter because he could not afford the boarding fees. Pacheco testified K.C. and Christine inquired about Magnum and were surprised to learn defendant had sold the horse. Pacheco recalled Christine responded, "[O]h, he's going to regret this."

¶ 38                                    b. Adverse Testimony of Christine

¶ 39        The defense recalled Christine as an adverse witness. She testified she followed this case very closely after she alerted authorities to the kitchen incident in 2021 and was "concerned" when the initial charge was dismissed. She further testified on the day of the kitchen incident, she contacted defendant's ex-wife and learned defendant had a similar case in the past. K.C. had overheard some of these conversations, and Christine later sat down with K.C. to talk about it.

¶ 40                                    c. Testimony of Defendant

¶ 41        Defendant, who was 60 years old at the time of the trial, testified he and Christine formed a friendship when he was selling horse tack online. Defendant later formed what he described as a friendship with K.C. Together, they would ride horses, fix vehicles, till dirt, and cut trees.

¶ 42        Defendant testified he lived with his mother until she died and he lost her house to foreclosure. Defendant put some of his belongings in storage and moved the rest to Christine's garage. Defendant later moved in with Christine and K.C., intending to stay there temporarily. Defendant sold one of his horses and boarded the other, Magnum, at Horizon View Farms. He explained to K.C. that he may have to sell Magnum as well because paying to board the horse stressed him financially. K.C. told defendant she wanted to "take over" caring for Magnum.

- 11 -

Defendant reached an agreement with Pacheco, wherein K.C. would work at the farm to cover Magnum's boarding fees. This agreement ended when K.C.'s employment was terminated after just a few weeks. Thereafter, defendant sold Magnum. Defendant admitted his relationship with Christine and K.C. deteriorated when they discovered he sold Magnum.

¶ 43    Defendant testified he sold Magnum just days before K.C. claimed he touched her inappropriately in the kitchen. Defendant recalled he was in the kitchen, making something to eat, when he turned around to grab something out of the cupboard and he "lost footing," fell into [K.C.]," and his hands "hit her back or bumped into her." He later noted the kitchen was small, with roughly three feet between the countertops on each side of the room. Defendant testified it got "awkwardly silent" after he bumped into K.C. and then he saw Christine "[m]aybe a second" after the contact with K.C. Defendant noted that as soon as it happened, everyone had "strange looks" on their faces, and he was still shocked about "losing [his] traction." A moment after it occurred, Christine appeared upset and told defendant "to get all [his] stuff out." Defendant testified he was in shock about what had occurred and did not say anything until moments later, when he tried to deescalate the situation by stating to K.C., "[I]s this the way you feel about [it]." He acknowledged it was an "awkward situation" that he did not want "blowing up." Defendant testified he was "just trying to say it was all an accident." He acknowledged his efforts to deescalate the situation failed, so "there was a parting of the friendship," and he left the residence and stayed at a motel.

¶ 44    Defendant denied ever having sexual intercourse with K.C. He was adamant he did not buy K.C. a sex toy or show her how to use one. He claimed the only items he purchased for K.C. were a pair of jeans and a shirt with a horse on it, but never any underwear.

¶ 45　　　　Defendant described the relationship between K.C. and Christine as "[s]ometimes not good," explaining they would argue a lot. Sometimes the arguments were about what K.C. wore. Defendant testified he "tried to stay out of all that," but he was aware that K.C. would take different clothes to change into at school and wanted to make Christine aware of that. Defendant recalled an instance when Christine found thong underwear in K.C.'s laundry. Christine made an accusation that K.C. and her friend stole the underwear from a store, and defendant denied any knowledge of where K.C. may have actually gotten the underwear. Defendant also denied ever exchanging provocative photos with K.C. or tying her up in any manner.

¶ 46　　　　On cross-examination, defendant acknowledged having photos of K.C. on his cell phone that were taken from a security camera he installed. The images depicted K.C. sweeping the back porch. Defendant denied having a romantic interest in K.C. He acknowledged using the Daybook application on his cell phone to document important incidents. He explained an entry in his Daybook from April 2020, where he wrote that K.C. told him about her deep feelings, was not in reference to himself. He acknowledged other Daybook entries, including one which stated, "[F]orever K.C.'s king," and one dated June 28, 2021, which read, "[W]hat a mess I got my[self] into," along with a frowny face emoji. When asked about the June 27, 2021, Daybook entry that referenced his purchase of a sex toy for K.C. and the notation that she had already used it, defendant denied making the purchase and proclaimed, "[T]hat Daybook entry is wrong." When asked about the videos on his cell phone, including a video titled, "Nudist teens riding horses naked in the wilderness," defendant further denied being attracted to teenage girls or having a fetish for naked teenagers. When defendant was shown a screenshot of a list of videos stored on his cell phone, he denied having any knowledge of the videos. Defendant also noted he did not

- 13 -

remember purchasing condoms at Meijer but did admit to keeping all his receipts and property together at Christine's house. He further denied purchasing condoms to have sex with K.C.

¶ 47 On redirect examination, defendant maintained he fell into K.C. in the kitchen and felt bad about the entire situation. He also clarified the Daybook entry that stated, "[W]hat a mess I got my[self] into," was not referring to touching K.C.'s butt with his hand but was in reference to selling Magnum. Defendant believed the sale of the horse "created arguments," made K.C. and Christine angry, and put him in a bad situation with them. Defendant also testified K.C. had access to his cell phone when he resided with her. In addition, despite the Meijer receipt bearing a date of June 27, 2021, defendant claimed the last time he was at Meijer was a week before the kitchen incident.

¶ 48 3. *The Trial Court's Verdict and Sentence*

¶ 49 After closing arguments, the trial court found defendant guilty on all six counts of criminal sexual assault and sentenced him to 180 years in prison. The court imposed a 3-year sentence for the domestic battery charge that would run concurrent to his 180-year sentence.

¶ 50 Defendant filed a motion for a "New Trial and/or to Reconsider Rulings" and later filed a more detailed amended motion. The motion was denied in its entirety in July 2024.

¶ 51 This appeal followed.

¶ 52 II. ANALYSIS

¶ 53 On appeal, defendant challenges his convictions for six counts of criminal sexual assault. He asserts the trial court erred in (1) finding him guilty beyond a reasonable doubt based on uncorroborated allegations of abuse, (2) allowing the State to use the Meijer receipt as substantive evidence in its closing argument and improperly considering the receipt as substantive evidence in its oral ruling regarding defendant's guilt, despite it being admitted for a

limited purpose, and (3) admitting K.C.'s statements to the nurse regarding defendant's alleged assaults. Defendant further contends the cumulative effect of the errors denied him a fair trial.

¶ 54                          A. Sufficiency of the Evidence

¶ 55          Defendant first challenges the sufficiency of the evidence regarding his convictions for criminal sexual assault. When faced with a challenge to the sufficiency of the evidence, "a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64. Under this standard of review, the trier of fact has the responsibility to fairly "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (Internal quotation marks omitted.) *Id.* It is not the function of a reviewing court to retry a defendant; thus, this court will not substitute its judgment for that of the trier of fact on issues regarding the weight of the evidence or the credibility of witnesses. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). In a bench trial, it is the trial court's responsibility to determine the credibility of witnesses, the weight to be given to the testimony, and to resolve inconsistencies therein. *People v. Galarza*, 2023 IL 127678, ¶ 25. In doing so, the trier of fact does not need to disregard inferences that flow normally from the evidence or search out all potential explanations consistent with innocence. *Id.*

¶ 56          "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Jackson*, 2020 IL 124112, ¶ 64. We will not reverse a conviction simply because the evidence is contradictory or because the defendant claims a witness was not credible. *Siguenza-Brito*, 235 Ill. 2d at 228. Where contradictions or flaws are shown to exist as

- 15 -

part of the testimony of a witness, it is the role of the factfinder to judge how those contradictions or flaws affect the credibility of the testimony as a whole. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). That said, while a factfinder's determination of a witness's credibility is entitled to great deference, its decision to accept testimony is neither conclusive nor binding on a reviewing court. *People v. Gray*, 2017 IL 120958, ¶ 35 (citing *Cunningham*, 212 Ill. 2d at 280). Its acceptance of testimony must be reasonable, and in some cases, a reviewing court may find flaws in the trial testimony that made it "impossible for any fact finder reasonably to accept any part of it." *Cunningham*, 212 Ill. 2d at 283.

¶ 57        Here, the evidence presented before the trial court demonstrated defendant took steps to develop a close relationship with K.C., a young teenager, after establishing a friendship with Christine, her mother. Defendant resided with K.C. and Christine for nearly two years, bonding with her over shared interests, such as working on projects in the garage, and their mutual affection for horses in general and Magnum, a horse that K.C. came to regard as her own. Christine testified she found thong underwear in their home and a sex toy box in K.C.'s room that she had never purchased for her. K.C. testified defendant bought those items for her. Christine also confirmed her Sunday routine involved using the home's only bathroom for 30 to 45 minutes, with both K.C. and the defendant present. It was during this time defendant took the opportunity to assault her. K.C recalled in detail how defendant would forcibly sexually assault her over a two-month span. In her Shining Star interviews, K.C. recounted in detail the assaults that took place, along with various other aspects of her relationship with defendant. Entries found in the Daybook application on defendant's cell phone revealed his sexual interest in K.C. and corroborated some of K.C.'s allegations, most notably that defendant bought her a sex toy.

Deputy Lee introduced still photos of K.C. from defendant's cell phone that were taken from home security camera videos—the very cameras defendant himself installed.

¶ 58 Defendant asserts K.C.'s testimony was "riddled with falsities and inconsistencies that left her credibility diminished by the end of [the] trial." Defendant specifically points to the fact that K.C. did not initially report to police or Shining Star counselors any inappropriate conduct of defendant beyond the initial kitchen incident, wherein defendant was caught rubbing her buttocks. It was not until after defendant's initial aggravated criminal sexual abuse charge was dismissed and he was charged with domestic battery that K.C.'s disclosure changed to allegations of sexual assault. We are unconvinced by defendant's argument.

¶ 59 Although the record reveals there were omissions and some inconsistencies in K.C.'s initial reporting, it bears repeating we will not reverse a conviction simply because the evidence is contradictory or because the defendant claims a witness was not credible. *Siguenza-Brito*, 235 Ill. 2d at 228. K.C.'s disclosures of the occurrences in the case were, as the trial court described them, incremental. K.C. considered defendant her friend and trusted him. She was just 13 years old when the assaults began. She testified defendant threatened to hurt or kill her, Christine, and her boyfriend if she told anyone. K.C., who only reported the kitchen incident because Christine witnessed it, admitted she did not reveal anything else at that time because she was uncomfortable and scared and acknowledged she had been arguing with Christine during that time. She testified she had changed in the year between the summers of 2021 and 2022 and felt more comfortable talking about what defendant had done to her. Under the circumstances, we determine it was not unreasonable for the court to find K.C.'s testimony credible. The court, as the factfinder, was in the best position to determine the credibility of all witness testimony,

and those credibility determinations are entitled to great deference. *Gray*, 2017 IL 120958, ¶ 35 (citing *Cunningham*, 212 Ill. 2d at 280).

¶ 60       In addition, although defendant emphasizes the existence of a motive for K.C. to lie or take some sort of revenge, namely, because defendant decided to sell Magnum, it was merely a factor for the trial court to consider in weighing her credibility. See *People v. Sexton*, 162 Ill. App. 3d 607, 613 (1987) ("[T]he presence of a motive to lie does not render a complainant's testimony unconvincing in and of itself. It is a factor to be considered in weighing the credibility of the witnesses."). The court noted it took this motive into account, weighed it against all the other testimony, and found K.C. to be credible.

¶ 61       Having reviewed the evidence and drawn the natural inferences in the light most favorable to the State, this court concludes the evidence was sufficient for a rational factfinder to find the elements of the six counts of criminal sexual assault proven beyond a reasonable doubt.

¶ 62                            B. The Receipt

¶ 63       1. *The State's Reference to the Meijer Receipt During Closing Arguments*

¶ 64       Next, defendant argues during closing arguments, the State improperly referred to the Meijer receipt as substantive evidence that defendant purchased condoms to use during his assaults of K.C., despite it being admitted for the limited purpose of showing defendant's residency.

¶ 65       The record reveals the trial court admitted the Meijer receipt prior to trial pursuant the State's fourth motion *in limine*. Citing *Neal*, the court determined, because the receipt was found among defendant's other mail in Christine's house, it did nothing more than "corroborate testimony" he lived at her home. At trial, the receipt was admitted for this limited purpose during Christine's testimony. Defendant does not object to the admission of the receipt for this purpose,

- 18 -

and as such, that issue is not before the court. However, during closing arguments, the State made the following reference to the Meijer receipt:

> "Your Honor also heard evidence regarding the receipt from Meijer for the condoms. Recall there is no other adult men [*sic*] living in this residence and the Defendant himself even testified that he was only friends with Christine, therefore [Y]our Honor can make a reasonable inference that those condoms from Meijer were for the Defendant to have sex with [K.C.]"

The State referred to the receipt again during its rebuttal, stating K.C.'s statements during her Shining Star interview were corroborated by the Meijer receipt and rebutted any suggestion she was influenced to make the statements.

¶ 66    We initially note the State argues defendant has not properly preserved this issue for appeal, as there was no contemporaneous objection at trial or posttrial motion. We disagree. "In criminal cases, this court has held consistently that a defendant preserves an issue for review by (1) raising it in either a motion *in limine* or a contemporaneous trial objection, and (2) including it in the posttrial motion." *People v. Denson*, 2014 IL 116231, ¶ 23. "[I]rrespective of which party initiates the *in limine* proceeding, as long as it occurs, the interests served are exactly the same." *Id.* ¶ 13. Here, the State filed a motion *in limine* seeking to admit the receipt, and the motion was litigated at a hearing where both parties had an opportunity to be heard. Defendant also filed a comprehensive posttrial motion and an amended posttrial motion, which asserted the trial court erred in placing too much weight on the receipt. Defendant need not raise his argument in his posttrial motion in precisely the same way as previously argued at the motion *in limine* hearing to preserve the issue. See *People v. Minter*, 2125 IL App (1st) 120958, ¶ 43 (holding the defendant did not need to make precisely the same argument to preserve it for

- 19 -

appeal); see also *People v. Heider*, 231 Ill. 2d 1, 18 (2008) (holding the defendant did not forfeit the issue where the trial court had an opportunity to address the issue below and the defendant did not raise a completely different objection on appeal.) Therefore, the issue was preserved for review.

¶ 67 On the merits, we determine the State's comments regarding the receipt were not error. Closing arguments are not evidence. *People v. Ward*, 2023 IL App (1st) 190364, ¶ 123. During closing arguments, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn therefrom, respond to comments made by defense counsel, and comment on the credibility of witnesses. *People v. Rader*, 178 Ill. App. 3d 453, 466 (1988). A prosecutorial comment is not reversible unless it is both improper and substantially prejudicial to the point where it is impossible to say whether a guilty verdict resulted from the comment. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety, and remarks must be viewed in context. *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994). Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue we review *de novo*. *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 127.

¶ 68 Although defendant cites the aforementioned portion of the State's closing argument to establish error, we are not persuaded. "Arguments and statements based upon the facts in evidence, or upon reasonable inferences drawn there from, are within the scope of closing argument." *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 62. It is "well settled that a prosecutor is allowed a great deal of latitude in closing argument and has the right to comment upon the evidence presented and upon reasonable inferences arising therefrom, even if such inferences are unfavorable to the defendant." *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 26.

We clarify the trial court's order and memorandum granting the State's motion regarding the receipt reasoned it was admitted for the limited purpose of showing defendant's residency. However, the court also noted the receipt presented circumstantial evidence, which it did not consider hearsay pursuant to *Neal*. Therefore, the court could also properly consider any circumstantial evidence and reasonable inferences that naturally flowed therefrom. This is precisely how the receipt was argued by the State during closing arguments—as circumstantial evidence the court should consider. In addition, the State's comment was an isolated remark which did not constitute a major theme in the argument. It bears repeating, in reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety, and remarks must be viewed in context. *Kitchen*, 159 Ill. 2d at 38. The comment by the State, when considered in the context of arguments by both parties, was not improper. Moreover, even if the comment had been improper, because this was a bench trial, prejudice was much less likely to result. See *People v. Jackson*, 250 Ill. App. 3d 192, 204 (1993). Most importantly, any error was not significant enough to justify overturning the verdict, as defendant's conviction was based largely on the other compelling evidence presented during the trial, as indicated in the judge's oral pronouncement of its ruling.

¶ 69        2. *The Trial Court's Comments Regarding the Meijer Receipt*

¶ 70        Defendant contends the trial court improperly considered the Meijer receipt as substantive evidence when making its oral findings regarding defendant's guilt. Defendant points to the court's statement, "There's evidence that the Defendant purchased a vibrator, thongs, condoms." This argument is without merit. Not only did the court make no reference to the Meijer receipt in this context, but it also acknowledged defendant denied purchasing those items. The court considered "everything together" and referred to K.C.'s testimony, defendant's

Daybook entries, and photos on his cellphone, and it made "a reasonable inference from that." The only time the court referred to the Meijer receipt was in the context of defendant testifying he did not remember purchasing any condoms. "[W]hen a trial court is the trier of fact a reviewing court presumes that the trial court considered only admissible evidence and disregarded inadmissible evidence in reaching its conclusion." *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). "[T]he presumption that a court in a bench trial considered only competent evidence in reaching its finding may be rebutted where the record affirmatively shows the contrary." (Internal quotation marks omitted.) *Id.* at 603-04. We find nothing to rebut the presumption that the court properly considered the evidence this case.

¶ 71                                C. Sharp's Statements

¶ 72        Defendant argues the trial court erred in allowing Sharp to testify about statements K.C. made regarding the alleged sexual assault. Defendant argues this was an error because Sharp testified she did not expect to observe any evidence of abuse during her examination, and her testimony only served to bolster K.C.'s hearsay statements, which lacked the required indicia of reliability. We disagree.

¶ 73        "Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted." *People v. Williams*, 2022 IL 126918, ¶ 52. Hearsay is generally barred from introduction at trial; however, the rule has many exceptions. See Ill. R. Evid. 802 (eff. Jan 1, 2011); *People v. Spicer*, 379 Ill. App. 3d 441, 449 (2007). Section 115-13 of the Code provides a statutory hearsay exception for statements made by victims of sex offenses to medical personnel. 725 ILCS 5/115-13 (West 2022). In the prosecution of certain sex offenses,

> "statements made by the victim to medical personnel for purposes of medical
> diagnosis or treatment[,] including descriptions of the cause of symptom, pain or

sensations, or the inception or general character of the cause or external source thereof[,] insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." *Id.* The trial court has discretion to determine whether a victim's statements to a medical professional fall within the medical diagnosis exception to the hearsay rule. *Spicer*, 379 Ill App. 3d at 450.

¶ 74 Although defendant contends this court should review this issue *de novo*, it is well settled that a trial court's decision regarding the admissibility of evidence will not be disturbed on review absent an abuse of discretion. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 68. " 'A trial court will not be found to have abused its discretion with respect to an evidentiary ruling unless it can be said that no reasonable man would take the view adopted by the court.' " *People v. Jackson*, 232 Ill. 2d 246, 265 (2009) (quoting *In re Leona W.*, 228 Ill. 2d 439, 460 (2008)). "Thus, this court will reverse only for an abuse of discretion of a trial court's determination that the medical diagnosis exception applies." *Spicer*, 379 Ill. App. 3d at 450 (citing *People v. Davis*, 337 Ill. App. 3d 977, 989-90 (2003)).

¶ 75 This court has held, " 'in examining a child suspected to be a victim of sexual abuse, details of the sexual acts including how, when, and where the act occurred and who was involved are pertinent information allowed under [section 115-13 of the Code].' " *People v. Boling*, 2014 IL App (4th) 120634, ¶ 101 (quoting *People v. March*, 250 Ill. App. 3d 1062, 1076 (1993)). This court has also held a victim's statements that are relevant to the victim's state of mind and emotional condition are also admissible under section 115-13 of the Code. *Id.* ¶ 102.

¶ 76 Here, Sharp's testimony contradicts defendant's assertion the exam did not serve any medical purpose. Sharp, who was qualified as an expert in the field of pediatric care and

child sexual abuse, testified her examination was for multiple purposes, which included not only looking for signs of abuse, but also checking for sexually transmitted diseases and counseling children about their bodies. Sharp's testimony that she did not expect to find any physical evidence of a sexual assault has no bearing on the rest of the information she collected for the purpose of treating K.C. because the purpose of the exam was not just physical. While she indicated she did not expect to find any physical injury due to the timing between the assaults and the exam, she clarified there was no way of knowing what the outcome of an exam would be until the exam was complete. While defendant argues the "sole purpose of Sharp's testimony was to repeat K.C.'s allegation that [defendant] sexually assaulted her" and her testimony was " 'an illusory reliance on the medical relationship *** to bootstrap an investigation and treat it as if it is a medical exam,' " the record belies that argument. Sharp was not used as a conduit for the admission of hearsay; she instead properly explained the information she learned in her capacity as a SANE nurse was for a medical purpose or diagnosis.

¶ 77        Consequently, we reject defendant's argument and conclude the trial court did not abuse its discretion by admitting Sharp's testimony regarding what K.C. divulged to her about the sexual assaults.

¶ 78        Finally, defendant argues the cumulative effect of the errors he contends occurred at the trial court level requires reversal. Because we have found no reversible error, there can be no cumulative error, and we affirm defendant's conviction. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 118 ("There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue.").

¶ 79                        III. CONCLUSION

¶ 80        For the reasons stated, we affirm the trial court's judgment.

¶ 81        Affirmed.